Opinion issued on December 27, 2002          



  
 










In The
Court of Appeals
For The
First District of Texas




NO. 01-99-00199-CV




PEARY PERRY AND MUNICIPAL COLLECTIONS, INC., Appellants

V.

GEORGE GREANIAS, Appellee




On Appeal from the 125th District Court
Harris County, Texas
Trial Court Cause No. 95-48089-C




OPINION ON REHEARING
          We deny appellant’s motion for rehearing, withdraw our opinion and judgment
dated May 23, 2002, and substitute this opinion in its stead. 
          Appellant, Peary Perry, sued appellee, George Greanias, former City of
Houston Controller, alleging libel, slander, intentional infliction of emotional distress,
and violations of his constitutional due process and free speech rights.


 Perry
challenges the trial court’s granting of Greanias’s motion for summary judgment
based on various affirmative defenses of immunity and privilege. We address
whether Greanias established the affirmative defenses of official immunity and
qualified immunity, as a matter of law, entitling him to summary judgment. We
affirm in part and reverse and remand in part.
FACTUAL BACKGROUND
A.      The Contract
          On May 5, 1993, the City of Houston entered into a contract with Municipal
Collections, Inc. (MCI) to collect delinquent traffic tickets. During the contract’s
term, Peary Perry was MCI’s president and chief executive officer, as well as its
majority shareholder. 
          Pursuant to the contract, MCI was to be paid a contingency fee of 28% of the
revenues it collected; the contingency fee was to be paid solely from monies collected
by MCI. The contract stated that the director of the Municipal Courts Administration
Department (MCAD) “shall have the exclusive right to approve the amount and
payment of any monies due to [MCI] under this Contract” and that payment would
be made to MCI when MCAD’s director receives and approves an MCI invoice. 
With regard to payment, the contract also stated, 
The City [of Houston] shall review each invoice and, within (15)
working days after its receipt, either approve it and deliver it to the
Controller’s office for payment, or return it to [MCI] with a statement
of the reasons for its rejection or non-approval. The City shall make
payment within 30 days of approval of [MCI’s] invoice.

From June 1993 through October 1994, MCAD’s director, Larry Miller, approved,
and the Controller’s Office paid, MCI’s invoices. Over a two-year period, MCI
received $3,000,000 from the city for its services.
          To comply with the city’s affirmative action policy, MCI subcontracted with
Bayou City Enterprises (BCE), a minority-owned business. The subcontract provided
that BCE will “manage in close coordination with MCI the systemic noticing of all
alleged Violators provided by the CITY and MCI.” In return for its services, BCE
was to receive 19% of MCI’s 28% contingency fee; however, the subcontract also
provided that BCE would pay MCI a monthly fee of $11,500 toward MCI’s
“operating expenses.” 
 
 
B.      The Audit
          George Greanias served as City of Houston Controller during the contract’s
term. As controller, Greanias was required to conduct audits on requests for payment
submitted to the city.


 One type of audit performed by Greanias’s office was the
“contract compliance audit” to determine whether the city was assuring compliance
with the terms and conditions of contracts to which it was a party. In November
1994, the Controller’s Office began a compliance audit of the MCI contract. 
          The audit covered the contract period of May 5, 1993, through March 31, 1995.
Its stated purpose was to determine (1) whether MCI delivered the collection services
it was contracted to provide, and (2) whether fees were paid to MCI according to the
contract terms. Early in the auditing process, the Controller’s Office began an
investigation into the services provided by BCE; however, BCE refused to cooperate
with the investigation. With regard to this investigation, the audit states: “The
Controller’s Office published a report [in January 1995] concluding that BCE had not
provided sufficient, competent and relevant evidence necessary to demonstrate that
BCE was providing a commercially useful function to the City.” In December 1994,
the Controller’s Office began withholding the portion of payment to BCE (i.e., the
19% of the 28% contingency payment) from payments made to MCI. The
Controller’s Office continued its audit of the MCI contract in March 1995. 
          The audit was published in July 1995; the auditors concluded as follows:
[MCAD] management cannot provide reasonable assurance that the
terms of the [MCI] contract have been followed. Major contract terms
and provisions have not been complied with. Most of the contract
deviations benefitted the contractor and have resulted in higher cost or
less service to the City. We estimate that the cost to the City resulting
from not adhering to the contract terms has been $1,044,000.
          Some of the more significant audit findings were summarized as follows:
1.The Contract has not been properly administered. Major contract
deviations have been permitted without approval from City
Council. Most of the findings noted below are the result of
deviations from contract terms and we estimate their cost to the
City to be in excess of $1,044,000.
 
2.MCI did not process mail payments as required by the contract. 
The City incurred additional cost of approximately $300,000 in
processing the mail payments for MCI. 
 
3.MCI has withheld $207,000 from the 19% of gross revenue that
the contract provides should have been paid to [BCE].
 
4.The City paid approximately $95,000 in fees to MCI for tickets
on which bonds were posted by the alleged violators after tickets
were assigned to MCI. Under the terms of the contract, MCI is
not entitled to a fee on these tickets.
 
5.The date first notices are sent was not documented in MCI’s
computer database. Incorrect first notice dates were used by
MCAD to determine MCI’s entitlement to a fee, thus resulting in
an overpayment to MCI of approximately $102,000.
 
6.The City paid MCI approximately $118,000 on tickets that the
assignment term exceeded the 210-day limit imposed by the
contract.
 
7.[MCI] did not provide the performance and payment bonds
required by the contract. We estimate that MCI was able to avoid
$112,000 of operating costs by not having to purchase these
bonds.
 
8.Fees of approximately $110,000 were paid to MCI on tickets that,
under the contract were not eligible for assignment because they
were not at least 30 days delinquent. 
          The published audit also incorporated MCAD’s and the Houston City
Attorney’s responses to the audit’s findings. Generally, both MCAD and the city
attorney disagreed with most of the audit’s findings. 
          Peary Perry’s name is not mentioned in either the published audit or in the
transmittal letter from Greanias to then-City of Houston Mayor Bob Lanier, which
forwards the audit and summarizes some of the audit’s findings and conclusions. 
Issues relating to how or why the city selected MCI as the successful contractor were
also not discussed in the audit. 
          Following the publication of the audit, Greanias withheld payment of $315,000
of the amount billed by MCI. Mayor Lanier terminated the MCI contract in August
1995. In a press release, Mayor Lanier stated as follows:
MCI has been rendered incapable of performing under its contract as a
consequence of payments actually withheld by the Controller, future
payments that he says he will withhold, and other payments that he says
he may withhold. . . . I want to limit the City’s potential liability as
much as I can by an early termination of the contract. With the August
withholding, the total amount withheld [from MCI] should approximate
$375,000. I am led to believe that the issue of who owns what part of
this money will be resolved by litigation. 
PROCEDURAL HISTORY
          Following the termination of the MCI contract, Perry and MCI filed suit against
the City of Houston and Greanias in his individual and official capacities. The claims
relevant to this appeal are Perry’s claims against Greanias individually for libel,
slander, and intentional infliction of emotional distress, as well as constitutional
claims alleging violations of Perry’s (1) federal constitutional due process and free
speech rights enforceable under 42 U.S.C. section 1983 and (2) Texas constitutional
rights to free speech and due process. 
          In support of his claims, Perry offered the following factual allegations in his
second amended petition:



Unbeknownst to Perry, as of January, 1995, GREANIAS was
specifically told that HOUSTON’s legal counsel had determined that
GREANIAS’ refusal to pay the full amount due under the contract had
no legal basis and that his continued refusal to pay the full amount due
under MCI’s contract could be a violation of the “14th amendment to the
U.S. Constitution as well as the Civil Rights Act” and that “city
employees” could also be “personally liable for participating in any
illegal withholding of funds.” . . . Thus, Greanias, individually and as
City Controller for the City of Houston, had actual notice of an
established constitutional right that inured to the benefit of Perry,
individually, and MCI; and GREANIAS had actual notice of the fact
that his actions could be a violation of the constitutional provision
prohibiting the taking of property without the due process of law. 
Nonetheless, GREANIAS persisted in withholding funds due and owing
MCI.

. . . .
 
After Perry spoke out about the illegality of withholding 19% of
the funds due to MCI, and after Perry grieved GREANIAS’ actions to
the Affirmative Action Committee, and after Perry was successful in
obtaining an affirmation of the legality of MCI’s subcontract with BCE,
GREANIAS sent another team of auditors to audit the records of MCI. 
This time the audit spanned a time period beginning in March of 1995
and continuing into June, with a written report issued in July, 1995.

. . . .
 
On July 18, 1995, GREANIAS released to the press his audit
report and began publically accusing MCI and PERRY, individually, of
overcharging HOUSTON in excess of one million dollars in violation
of the contract. Daily press coverage continued and GREANIAS
repeatedly issued statements including the same allegations of
wrongdoing on the part of MCI and PERRY, individually. The public
accusations of wrongdoing made by GREANIAS, individually, and as
the agent of HOUSTON, were false.

. . . .
 
During October and November of 1995, GREANIAS increased
the scope of his public comments to include accusations that the contract
let to MCI was related to political and personal connections between
PERRY, individually, and the mayor of HOUSTON, Bob Lanier, who
was running for re-election. Prior to the publication of GREANIAS’
accusations that the collection contract was a political favor from Lanier
to PERRY, GREANIAS, and his staff, had conducted an investigation
into the process by which the collection contract was awarded to MCI;
and GREANIAS knew or, absent reckless disregard, should have known
that PERRY was not even associated with MCI at the time that MCI was
selected by HOUSTON as the preferred contractor for the collection
contract.
 
Also beginning in late September, GREANIAS suggested to the
press that the matter had been referred to the FBI for investigation. 
From that time through the November election, news stories focused on
the potential for criminal charges to be brought by the FBI including
allegations that “competition for the contract was [rigged] in PERRY’s
favor.” The public disclosure of FBI involvement clearly imputed
criminal activity to PERRY, individually, thereby stigmatizing
PERRY’s name, and damaging his personal reputation, as well as the
reputation of the company. The charges of criminal activity against
PERRY and publicized by GREANIAS, individually, and, as the agent
of HOUSTON, were false.

          Greanias moved for summary judgment on Perry’s claims against him on the
following theories: (1) absolute privilege—based on quasi-judicial and executive
privilege, (2) official immunity, and (3) qualified privilege. The trial court granted
Greanias’s motion for summary judgment and entered a take-nothing judgment on
Perry’s claims against Greanias, but did not state the grounds for its decision in the
order. Greanias obtained a severance of Perry’s claims against him, rendering the
summary judgment final for purposes of this appeal. In three issues, Perry challenges
the propriety of the bases underlying the summary judgment.
SUMMARY JUDGMENT STANDARD OF REVIEW
          In a summary judgment case, the issue on appeal is whether the movant met its
summary judgment burden by establishing that no genuine issue of material fact
exists and that it is entitled to judgment as a matter of law. Tex. R. Civ. P. 166a(c);
Calvillo v. Gonzalez, 922 S.W.2d 928, 929 (Tex. 1996). The burden of proof is on
the movant, and all doubts about the existence of a genuine issue of material fact are
resolved against the movant. Rhone-Poulenc, Inc. v. Steel, 997 S.W.2d 217, 223
(Tex. 1999).
          A defendant is entitled to summary judgment on an affirmative defense if the
defendant conclusively proves all the elements of the affirmative defense. Cathey v.
Booth, 900 S.W.2d 339, 341 (Tex. 1995). To conclusively prove all of the elements
of the affirmative defense, the movant must present summary judgment evidence that
establishes each element of the affirmative defense as a matter of law. Ryland Group,
Inc. v. Hood, 924 S.W.2d 120, 121 (Tex. 1996). If the defendant meets this burden,
the plaintiff must then produce evidence raising a genuine issue of material fact to
avoid the affirmative defense. Nichols v. Smith, 507 S.W.2d 518, 520-21 (Tex.
1974); Gonzalez v. City of Harlingen, 814 S.W.2d 109, 112 (Tex. App.—Corpus
Christi 1991, writ denied). When a trial court does not state the basis for its decision
in its summary judgment order, as in this case, we must uphold the order if any of the
theories advanced in the motion is meritorious. Cincinnati Life Ins. Co. v. Cates, 927
S.W.2d 623, 626 (Tex. 1996); Cigna Ins. Co. v. Rubalcada, 960 S.W.2d 408, 412
(Tex. App.—Houston [1st Dist.] 1998, no pet.). 
DISCUSSION
          In Perry’s first issue, he presents three separate arguments in support of his
position that Greanias failed to meet his burden to establish his defensive theories of
official immunity, absolute privilege, or qualified privilege: (1) Greanias failed to
prove that the City of Houston, and Greanias, as an agent of the city, engaged in a
governmental function, rather than a proprietary function; (2) even if the city engaged
in a governmental function, Greanias failed to produce sufficient evidence to prove
that he was engaged in governmental activity, as opposed to administrative activity;
and (3) Greanias failed to produce sufficient evidence to prove that his actions were
discretionary, rather than ministerial, or that he acted in good faith. Although this is
a multifarious issue, we will address each properly raised contention necessary for the
issue’s disposition. See Tex. R. App. P. 38.1(e). 
          As a preliminary matter, we note that Perry’s state and federal constitutional
claims are based on Greanias’s actions related to conducting and acting on the audit;
however, Perry’s claims for slander, libel, and intentional infliction of emotional
distress are based on two separate and distinct grounds: (1) Greanias’s conduct and
statements relating to the audit, and (2) Greanias’s alleged defamatory statements
made after the audit was published. Therefore, we will separately analyze each of
these grounds to determine whether the affirmative defenses and immunity theories
asserted by Greanias in his motion for summary judgment apply to either or both
grounds.
A.      Actions Relating to Conducting the Audit and Acting on its Findings
          1.       Official Immunity
          In his motion for summary judgment, Greanias asserted that he is entitled to the
affirmative defense of official immunity. Government employees or officials are
entitled to immunity from liability for damages arising from the performance of (1)
discretionary duties (2) executed in good faith (3) while acting within the scope of
their authority. City of Lancaster v. Chambers, 883 S.W.2d 650, 653 (Tex. 1994);
Scott v. Britton, 16 S.W.3d 173, 177 (Tex. App.—Houston [1st Dist.] 2000, no pet.). 
          Official immunity is a common law defense that protects government officers
from personal liability for the good-faith performance of discretionary duties within
the scope of their authority. Chambers, 883 S.W.2d at 653-54. The purpose of
official immunity was explained by the supreme court in Kassen v. Hatley:
The purpose of official immunity is to insulate the functioning of
government from the harassment of litigation, not to protect erring
officials. The public would suffer if government officers, who must
exercise judgment and discretion in their jobs, were subject to civil
lawsuits that second-guessed their decisions. Official immunity
increases the efficiency of employees because they need not spend time
defending frivolous charges. 
887 S.W.2d 4, 8 (Tex. 1994) (citations omitted). Thus, the articulated basis for such
immunity is the importance of avoiding distraction of officials from their
governmental duties, the desire to avoid inhibition of discretionary actions,
minimizing deterrence of able people from public service, avoiding the cost of an
unnecessary trial, and insulating officials from burdensome discovery. Travis v. City
of Mesquite, 830 S.W.2d 94, 102 n.4 (Cornyn, J., concurring).
                    a.       Proprietary versus Governmental Functions
          Before determining whether Greanias proved each element of official immunity
as a matter of law, we first address Perry’s contention that Greanias’s claim of official
immunity fails because the city engaged in a “proprietary” function, as opposed to a
“governmental” function, when it, through Greanias, audited the MCI contract and
withheld payment based on the audit’s findings.


 Greanias responds that whether
such activity was a proprietary or a governmental function is inapposite to whether
he is entitled to official immunity. Greanias asserts that, while a municipality is
entitled to sovereign immunity related to the performance of its governmental
functions, but not its proprietary functions, such a distinction is not germane to a
determination of whether a government employee is entitled to official immunity. 
Because we conclude that Greanias’s conduct of engaging in the audit and acting on
its findings is inherently governmental, we leave for another day the question of
whether a municipal official engaged in a discretionary activity in the course of
performing a proprietary function is entitled to official immunity.
          Perry argues that conducting the audit was a proprietary function because no
state statute requires that Greanias perform the audit. The Texas Legislature has
defined “governmental functions” as those which are “enjoined on a municipality by
law and are given it by the state as part of the state’s sovereignty, to be exercised by
the municipality in the interest of the general public.” Tex. Civ. Prac. & Rem. Code
Ann. § 101.0215(a) (Vernon Supp. 2002). A proprietary function is one performed
by a city, in its discretion, primarily for the benefit of those within the corporate limits
of the municipality rather than for use by the general public. Bailey v. City of Austin,
972 S.W.2d 180, 193 (Tex. App.—Austin 1998, pet. denied) (citing City of
Gladewater v. Pike, 727 S.W.2d 514, 519 (Tex. 1987)). 
          Here, the Houston City Charter prescribes that the city controller cannot pay
any debt owed by the city “until he has audited and examined the claim and found the
same justly and legally due and payable, and that the payment has been legally
authorized.” Houston, Tex., City Charter art. VIII, § 3 (Act of 1905; added by
amend. Oct. 15, 1913). Perry contends that because Greanias’s authority for
performing the audit arises from the Houston City Charter, as opposed to a state
statute, it is not a “governmental function,” as defined by the legislature. However,
there is no indication that the legislature’s definition in subsection 101.0215(a) is the
exclusive definition of a governmental function. Texas courts have defined
“governmental functions” as those “public acts which the municipality performs ‘as
the agent of the State in furtherance of general law for the interest of the public at
large.’” Bailey, 972 S.W.2d at 193 (citing Gates v. City of Dallas, 704 S.W.2d 737,
738 (Tex. 1986) (quoting City of Crystal City v. Crystal City Country Club, 486
S.W.2d 887, 889 (Tex. Civ. App.—Beaumont 1972, writ ref’d n.r.e.)). As one court
stated: “[T]he key difference between governmental and proprietary functions–both
of which are performed by municipalities for the benefit of their citizens–is this:
Governmental functions are what a municipality must do for its citizens and
proprietary functions are what a municipality may, in its discretion, perform for its
inhabitants.” Oldfield v. City of Houston, 15 S.W.3d 219, 226 (Tex. App.—Houston
[14th Dist.] 2000, pet. denied) (emphasis in original). Applying this definition, we
conclude that Greanias’s audit of the MCI contract was a “governmental function.” 
          Home-rule cities, such as Houston, derive their powers not from the legislature,
but from the Texas Constitution. See Tex. Const. art. XI, § 5 (authorizing cities
having more than five thousand inhabitants to adopt home rule charter); see also
Proctor v. Andrews, 972 S.W.2d 729, 733 (Tex. 1998). A home-rule city possess the
full power of self-government. See Dallas Merchant’s and Concessionaire’s Ass’n
v. City of Dallas, 852 S.W.2d 489, 490-91 (Tex. 1993); see also Tex. Loc. Gov’t
Code § 51.072 (Vernon 1999) (providing home rule cities have power of local self-government). A home-rule city’s charter is its organic act; it is the fundamental law
of the municipality just as a constitution is the fundamental law of a state. See
Anderson v. City of San Antonio, 67 S.W.2d 1036, 1037 (Tex. 1934); Texas River
Barges v. City of San Antonio, 21 S.W.3d 347, 354 (Tex. App.—San Antonio 2000,
pet. denied). 
          The right to manage fiscal affairs is a defining characteristic of self-government. See Tex. Loc. Gov’t Code Ann. § 101.022 (Vernon 1999) (stating
home-rule municipality may control and manage its finances). Like the power of
taxation, the power to manage fiscal affairs “‘is an essential and inherent attribute of
sovereignty belonging as a matter of right to every independent government.’” City
of San Angelo v. Deutsch, 91 S.W.2d 308, 309 (Tex. 1936) (quoting Cooley’s, The
Law of Taxation (4th Ed.) vol. 1, § 57). Without such ability, a home-rule city
such as Houston would be unable to provide the essential services it owes its citizens. 
As part of its fiscal responsibility, the city owes a duty to its inhabitants to prevent
waste of public funds, which are held in trust for the accomplishment of certain
municipal purposes. Thus, the city’s duty to manage its fiscal affairs necessarily
includes a pre-payment audit of expenditures. Based on these principles, we conclude
that Greanias’s conduct related to the audit of the MCI contract was a governmental
function.
          We turn next to whether Greanias established the necessary elements of official
immunity.
                    b.       Discretionary Duty
          To ascertain whether Greanias is entitled to official immunity, this Court must
determine if the conduct in question is discretionary or ministerial. An official is not
entitled to immunity when he performs a ministerial duty. Kassen, 887 S.W.2d at 9;
Scott, 16 S.W.3d at 177. If an act involves personal deliberation, decision, and
judgment, it is discretionary; actions that require obedience to orders, or the
performance of a duty to which the actor has no choice, are ministerial. Chambers,
883 S.W.2d at 654; City of Columbus v. Barnstone, 921 S.W.2d 268, 272 (Tex.
App.—Houston [1st Dist.] 1995, no writ).
          Greanias’s summary judgment evidence included his affidavit, a copy of the
City of Houston Charter, the audit, and the MCI contract. In his affidavit, Greanias
provided the following description of the audit process:
The Controller’s Office exercised significant discretion in its
management of desk and field audits. . . . Among the issues within the
judgment and discretion of the Controller’s Office with regard to audits
were the criteria for which audits would be performed, the determination
of what was required to meet professional standards for public sector
audits, and the priority to be given to various audit issues. Management
of audits also involved hearing and ascertaining facts, as when the
Controller’s Office would review and perhaps question documentation
submitted in support of a payment request. Binding orders and
judgments were also part of the audit process, as when the Controller’s
Office would determine that it would not pay on a specific invoice. . . . 
The audit program from time to time also required the taking of written
and oral evidence, such as information about operation of a particular
contract

. . . . 
 
The Controller’s Office during my tenure conducted field audits in
compliance with Generally Accepted Auditing Standards (“GAAS”) and
Generally Accepted Governmental Auditing Standards (“GAGAS”). 
Among the requirements of GAAS and GAGAS was that the audit be
published. This requirement was also effectively imposed on the
Controller’s Office by the Texas Open Records Act. During my eight
years as Controller, the standard practice was to publish audit findings. 
Lesser audit findings were communicated by the Controller’s Office to
management through a separate document. Field audits were primarily
the responsibility of the Internal Audit Division of the Controller’s
Office. In a field audit, the Controller’s Office auditors went to the
source of the documentation being provided in support of a request for
payment. For example, the auditors would go on site to the original
records and staff of a department managing a contract for which the
Controller’s Office was receiving requests for payments. Among the
different types of field audits was the contract compliance audit, in
which the auditors reviewed a contract into which the City had entered
to determine whether the City was assuring compliance with its terms
and conditions.

. . . . 
 
In the fall of 1994, the Controller’s Office determined that it
would conduct a contract compliance audit of the management by
[MCAD] of the contract for the collection of delinquent tickets between
the City and [MCI] in which the City had named [BCE] a participant. .
. . The decision to conduct the Audit was made by the Controller’s
Office based on its judgment and discretion. 
 
In conducting the Audit, the Controller’s Office regularly and
repeatedly exercised its judgment and discretion, heard and determined
or ascertained facts on which the Office based its decisions, made
binding orders and judgments, affected the personal or property rights
of private persons, examined written and oral evidence, and enforced its
decisions or imposed penalties. The context for this process was set by
the Charter, as well as by the professional audit standards established
through GAAS and GAGAS. 
 
For example, the Controller’s Office exercised discretion as to the
scope of the Audit. Although questions had been raised about why the
City had awarded MCI the Contract, and although questions would later
arise about BCE, the Controller’s Office chose to limit the scope of the
Audit to a contract compliance review testing whether MCAD had
enforced the Contract in accordance with its term and conditions. 
Likewise, the Controller’s Office later exercised judgment and
discretion in determining that, since BCE had not presented competent
evidence of work done in exchange [for] City funds received,
compliance with GAAS and GAGAS required that the Controller’s
Office publish an investigative review rather than an audit report. The
Controller’s Office also exercised judgment and discretion in
determining the range of materials reviewed in the course of the Audit
in affording MCAD, MCI, BCE, and others significant opportunities to
provide information, and in evaluating that information.
 
During the course of the Audit, the Controller’s Office also
exercised its authority to hear and determine or ascertain facts, and make
decisions based on those facts. As noted above, a range of individuals
and entities were given the opportunity to provide written and oral
evidence to be considered by the auditors in the process. A number of
individuals were afforded the opportunity to provide testimony about the
Contract and its operations. Some of this information was actually
included in the Audit in the form of written responses from MCAD and
Legal Department. The Controller’s Office, however, made the final
decisions as to the weight to be given to that information, and the effect
that information would have on the Audit.

. . . . 
 
The Controller’s Office had the authority pursuant to the Charter
to enforce its decisions, and to impose penalties, both of which were
exercised with respect to the Audit, or in the subsequent responses of the
Controller’s Office to the Audit findings. The Controller’s Office made
the decision to conduct the Audit, and did so. The Controller’s Office
made the decision to include BCE in the work on the Audit, and did so. 
The Controller’s Office determined that, in the absence of competent
documentary evidence, the Charter required that the Controller’s Office
withhold further payments that would go to BCE. The Controller’s
Office determined the final contents of the Audit, after evaluating the
testimony of all those who provided information, as well as all of the
documents made available, and after applying the appropriate testing
and evaluation techniques that were, in the opinion of the Controller’s
Office, required by the professional standards established by GAAS and
GAGAS. The Controller’s Office also made the decision, in September
1995, and based on the Audit findings, to offset certain amounts owed
by MCI against certain amounts owed by the City to MCI.
 
          Consistent with Greanias’s statements in the affidavit, the published audit
indicated that its scope “consisted principally of inquiries of MCAD and MCI
personnel, testing of MCI’s records, and analytical review.” 
          Although the city charter mandated that Greanias not pay any debt owed by the
city “until he has audited and examined the claim and found the same justly and
legally due and payable, and that the payment has been legally authorized,” the
charter does not specify the manner or method for conducting such audits. Houston,
Tex., City Charter art. VIII, § 3. Thus, the method and manner in which the
Controller’s Office conducted the MCI audit was determined by Greanias, as stated
in his affidavit. See Guerrero v. Tarrant County Mortician Servs. Co., 977 S.W.2d
829, 833 (Tex. App.—Fort Worth 1998, pet. denied) (finding that mortician service
hired by medical examiner engaged in discretionary act even though medical
examiner had duty to pick up dead bodies because statute relating to picking up of
bodies is completely silent regarding manner and method by which medical examiner
takes charge of body).
          We find that the summary judgment evidence established that Greanias used
personal deliberation, decision, and judgment to (1) determine the type of audit to
conduct, (2) the extent and manner of investigation, (3) determine what data to
review, (4) analyze the data collected, (4) prepare the findings and conclusions of the
audit based on the analysis, and (5) withhold BCE’s share and offset monies owed to
MCI. Thus, Greanias’s conduct relating to the audit, on which Perry bases his
complaints, was discretionary as defined in Kassan.


 See 887 S.W.2d at 9.
                    c.       Good Faith
          This Court must measure good faith in official immunity cases against a
standard of objective reasonableness, without regard to the official’s subjective state
of mind. Chambers, 883 S.W.2d at 656; Scott, 16 S.W.3d at 179. To be entitled to
summary judgment, an official must prove that a reasonably prudent official might
have believed that the action taken was appropriate. Wadewitz v. Montgomery, 951
S.W.2d 464, 467 (Tex. 1997); Chambers, 883 S.W.2d at 656-57; Scott, 16 S.W.3d at
179. The official need not prove that it would have been unreasonable to take
different action, nor that all reasonably prudent officials would have acted as he did. 
Wadewitz, 951 S.W.2d at 467; Chambers, 883 S.W.2d at 656-57; Scott, 16 S.W.3d
at 179.
          Greanias produced summary judgment evidence demonstrating that his actions
in conducting the audit and acting on its findings were objectively reasonable. In
particular, Greanias’s affidavit stated that (1) Greanias was not only authorized, but
obligated under the city charter, to perform the audit; (2) Greanias utilized generally
accepted accounting practices in conducting and publishing the audit; and (3) “a
range of individuals and entities were given the opportunity to provide written and
oral evidence to be considered by the auditors.” Additionally, the summary judgment
evidence showed that (1) the city charter forbade Greanias from paying any debt that
he determined was not legally owed by the city, and (2) the MCI contract expressly
contemplated and gave Greanias the right to conduct the audit. 
          To controvert the official’s summary judgment proof on good faith, the plaintiff
must show that “no reasonable person in the defendant’s position could have thought
the facts were such that they justified defendant’s acts.” Chambers, 883 S.W.2d at
657 (citation omitted). Perry alleged in his response, and stated in his affidavit
offered in support of the response, that Greanias did not act in good faith because the
audit was a sham to show wrongdoing by Perry and was motivated by Greanias’s
personal animus toward Perry and Mayor Lanier. However, affidavits consisting of
nothing more than conclusions or expressions of subjective belief are not competent
summary judgment proof. Brownlee v. Brownlee, 665 S.W.2d 111, 112 (Tex. 1984). 
Moreover, the audit does not mention or identify Perry or any wrongdoing by him
individually.
          Perry also contends that Greanias did not act in good faith in withholding
BCE’s 19% share from the contingency fee payments. However, a corporate
stockholder cannot recover damages personally for wrong done solely to the
corporation. Wingate v. Hajdik, 795 S.W.2d 717, 719 (Tex. 1990). As such, Perry’s
allegation that Greanias was not entitled to withhold payment of BCE’s share from
MCI cannot form the basis of Perry’s individual claims under state law for slander,
defamation, intentional infliction of emotional distress, or violations of his due
process and free speech rights under the Texas Constitution. We conclude that
Greanias has shown that he acted in good faith in conducting the audit and acting on
its findings.
                    d.       Scope of Authority
          Officials must act within the scope of their authority in order to qualify for
official immunity. Chambers, 883 S.W.2d at 658. An official acts within the scope
of his authority if he is discharging the duties generally assigned to him. Id.
          Article VIII of the city charter defines the scope of the city controller’s duties:
“It shall be the duty of the controller to superintend and supervise the fiscal affairs of
the City of Houston, and manage and conduct the same as prescribed by this Charter
and the ordinances of the City of Houston that are now or may be hereafter enacted
. . . .” Houston, Tex., City Charter art. VIII, § 2 (Act of 1905; added by amend.
Oct. 15, 1913; amended August 14, 1982). 
          With regard to the specific duties of the controller, the city charter provides as
follows:
He shall, whenever deemed necessary, require all accounts presented to
him for settlement or payment to be certified to by affidavit, and he is
hereby authorized to administer oaths, with authority to compel and
require persons to answer such questions as may be propounded to them
touching the correctness of any account or claim against the city. He
shall require all persons who shall have received any moneys belonging
to the city, and not having accounted therefor, to settle their accounts,
and it is hereby made his duty from time to time to require all persons
receiving moneys, or having the disposition or management of any
property of the city of which an account is kept in his office, to render
statements thereof to him . . . .
 
No disbursing officer of the city, nor any one having money in his
possession for the account of the city, shall pay the same to any person
or persons for the account of the city, except to the regularly designated
officer or custodian of the public funds for the city, except upon draft or
warrant countersigned by the controller of the City of Houston, and all
signed by the mayor; and the controller shall not countersign any such
draft or warrant until he has audited and examined the claim and found
the same justly and legally due and payable, and that the payment has
been legally authorized, and appropriation therefor duly made, and that
the appropriation has not been exhausted.
Id. at art. VIII, § 3 (Act of 1905).
          In his affidavit, Greanias also describes what his duties were when he was city
controller:
Pursuant to the requirements of the Charter, as amplified upon by
ordinance, the Controller’s office during my tenure issued annual,
monthly, and interim financial reports, determined accounting policies
and practices for the City, processed all requests for payment and issued
all checks, managed the City’s cash portfolio, and took a lead
responsibility in the City’s debt program.

. . . .
 
The decisions of the Controller’s Office could, and from time to
time did, affect the personal or property rights of private persons. . . .
[T]he Controller’s Office could withhold a check from a proposed
payee, or decide to offset against a check to that payee. Withholding
involved the Controller’s Office suspending a payment pending further
information in support of the expenditure. Offset occurred when the
Controller’s Office reduced the amount paid to a payee by whatever
amounts the payee owed the City. Withholding and offset were both
based on the Charter-mandated responsibilities of the Controller’s
Office, which are found in Article VIII, Section 3, of the Charter. 
 
The Controller’s Office was also engaged daily in enforcing its
decisions, imposing penalties, or both. Questions of accounting policy
and practice could be both large and small; the issue for the Controller’s 
Office might be the policy and practice, or it might be the application of
the policy or practice. Either way, the question required the Controller’s
Office to make a decision. . . .
 
The Charter also requires the Controller to conduct audits on
requests for payments from the City. . . . To fulfill this responsibility,
the Controller’s Office practice was to perform a desk audit on virtually,
if not all requests for payment. . . . 

. . . . 
 
The Controller’s Office during my tenure conducted field audits. 
. . . Field audits were primarily the responsibility of the Internal Audit
Division of the Controller’s Office. . . . Among the different types of
field audits was the contract compliance audit, in which the auditors
reviewed a contract into which the City had entered to determine
whether the City was assuring compliance with its terms and conditions.
 
During my eight years as Controller, the Controller’s Office
performed at least 300 audits. . . . A number of them involved
withholding or offsets. . . . 

          Based on the language of the city charter, and, as described in Greanias’s
affidavit, Greanias acted within the scope of his authority when he conducted the
MCI audit and acted on its findings. 
          We hold that Greanias was immune from liability in connection with Perry’s
claims for violations of his due process and free speech rights under the Texas
Constitution, and is immune from liability in connection with Perry’s claims for
slander, defamation, and intentional infliction of emotional distress that are premised
on Greanias’s actions and statements related to conducting the audit and acting on its
findings. 
 
          2.       Qualified Immunity For Section 1983 Claims
          Perry has brought claims against Greanias under 42 U.S.C. section 1983 for
violations of his federal constitutional First Amendment right of free speech and
Fourteenth Amendment right of due process. Greanias asserts he is entitled to
qualified immunity on these claims. 
          Qualified immunity is an immunity from liability available to government
officials sued in their individual capacities under section 1983. Scott, 16 S.W.3d at
180; Haynes v. City of Beaumont, 35 S.W.3d 166, 175 (Tex. App.—Texarkana 2000,
no pet.). Government officials performing discretionary functions have qualified
immunity from liability for actions that do not violate clearly established statutory or
constitutional rights of which a reasonable person would have known. Wilson v.
Layne, 526 U.S. 603, 614, 119 S. Ct. 1692, 1699 (1999); Scott, 16 S.W.3d at 180. 
          In the case of a qualified immunity defense to a section1983 claim, once the
defendant official pleads good faith and demonstrates that his actions occurred in the
context of his discretionary authority, the burden shifts to the plaintiff to rebut this
defense by establishing that the official’s allegedly wrongful conduct violated clearly
established law. Thomas v. Collins, 860 S.W.2d 500, 503 (Tex. App.—Houston [1st
Dist.] 1993, writ denied); Carrera v. Yepez, 6 S.W.3d 654, 661 (Tex. App.—El Paso
1999, pet. dism’d w.o.j.). The plaintiff must show that (1) the official’s conduct
violated a federally guaranteed right, (2) the right was clearly established, and (3) the
official’s conduct was objectively unreasonable in light of the clearly established
right. Thomas, 860 S.W.2d at 503; Haynes, 35 S.W.3d at 176. Here, Greanias
asserted qualified immunity in his motion for summary judgment, and it is undisputed
that he was a government official. 
          As discussed above, the summary judgment evidence showed that Greanias’s
actions of conducting the audit and acting on its findings involved the exercise of
discretion. As such, the burden then shifted to Perry to rebut Greanias’s qualified
immunity defense relating to his section 1983 claims based on those allegations. In
this case, Perry failed to present any responsive argument that (1) Greanias’s conduct
violated his federally guaranteed rights, (2) the rights were clearly established, and
(3) Greanias’s conduct was objectively unreasonable in light of the clearly established
rights. Therefore, the trial court properly granted summary judgment on Perry’s
federal constitutional claims brought under section 1983. See Haynes, 35 S.W.3d at
176 (holding that trial court was authorized to grant summary judgment on section
1983 claims because plaintiff failed to respond to motion for summary judgment and
did not meet burden to rebut qualified immunity defense). 
 
 
B.      Greanias’s Post-Audit Statements
          We now turn to the other factual allegations that form the basis of Perry’s
claims for libel, slander, and intentional infliction of emotional distress, i.e,
Greanias’s alleged public statements that the contract was awarded to MCI as a
political favor from Mayor Lanier to Perry, and Greanias’s alleged statements to the
media that the matter had been referred to the FBI for investigation. Although these
allegations were clearly stated in Perry’s Second Amended Petition, which was the
live pleading at the time the trial court granted summary judgement, Greanias failed
to offer any arguments or summary judgment evidence establishing that his defensive
theories precluded either liability or suit based on these allegations. Instead, Greanias
limited his arguments to Perry’s allegations relating to Greanias’s actions and
statements involved in the audit.


 
          A motion for summary judgment must stand or fall on the grounds expressly
presented in the motion. Cincinnati Life Ins. Co. v. Cates, 927 S.W.2d 623, 625 (Tex.
1996); McConnell v. Southside Indep. Sch. Dist., 858 S.W.2d 337, 341 (Tex. 1993). 
We are restricted to reviewing the propriety of the granting of the summary judgment
on the basis of the grounds actually asserted in the motion for summary judgment. 
Cates, 927 S.W.2d at 626; Home Indem. Co. v. Pate, 814 S.W.2d 497, 500 (Tex.
App.—Houston [1st Dist.] 1991, writ denied). A trial court errs in granting more
relief than was requested by disposing of issues never presented to it in the motion
for summary judgment. See Mafrige v. Ross, 866 S.W.2d 590, 592 (Tex. 1993),
overruled on other grounds, Lehmann v. Har-Con Corp., 39 S.W.3d 191 (Tex. 2001). 
It is reversible error to grant a motion for summary judgment on a cause of action not
addressed in the motion for summary judgment. Chessher v. Southwestern Bell Tel.
Co., 658 S.W.2d 563, 564 (Tex. 1983); Smith v. Atlantic Richfield Co., 927 S.W.2d
85, 88 (Tex. App.—Houston [1st Dist.] 1996, writ denied). 
          Perry’s allegations that (1) Greanias made public statements that the contract
was awarded to MCI as a political favor from Mayor Lanier to Perry and (2) Greanias
told the media that the matter had been referred to the FBI for investigation, were not
addressed in Greanias’s motion. Thus, the trial court granted more relief than
requested by Greanias in his motion for summary judgment and erred in rendering
summary judgment in favor of Greanias as to Perry’s claims for slander, defamation,
and intentional infliction of emotional distress to the extent that such causes of action
were based on the post-audit statements.


 See Farah v. Mafrige & Kormanik, P.C.,
927 S.W.2d 663, 673 (Tex. App.—Houston [1st Dist.] 1996, no writ) (reversing
summary judgment in legal malpractice action in which defendants’ motion for
summary judgment did not address plaintiff’s contention that defendants should have
asserted particular claim in underlying suit).
          We overrule Perry’s first issue based on our holding that (1) Greanias is
immune from liability in connection with Perry’s claims of violations of his due
process and free speech rights under the Texas and United States Constitutions, and
(2) Greanias is immune from liability in connection with Perry’s claims of slander,
defamation, and intentional infliction of emotional distress that are based on
Greanias’s conduct related to the audit; however, we sustain Perry’s first issue to the
extent that we hold Greanias is not entitled to summary judgment on Perry’s claims
of libel, slander, and intentional infliction of emotional distress that are based on his
allegations relating to Greanias’s alleged post-audit statements. 
C.      Justification Defense
          In issue three, Perry contends that Greanias was not entitled to the affirmative
defense of legal justification as stated in Texas Beef Cattle Co. v. Green, 921 S.W.2d
203, 211 (Tex. 1996), which Greanias raised in his motion for summary judgment, as
a defense to Perry’s claim for tortious interference with contract. However, as
Greanias states in his brief, Perry did not assert a claim for tortious interference with
contract against Greanias in his Second Amended Petition. This claim was only
asserted by Perry against the City of Houston.
          We overrule Perry’s issue three. We need not address Perry’s issue two
relating to Greanias’s defense of quasi-judicial privilege, which was raised only in
connection with Greanias’s conduct related to the audit.
 
 
CONCLUSION
          The trial court properly granted summary judgment with respect to Perry’s
claims for (1) violations of his due process and free speech rights under the Texas
Constitution and (2) violations of his First Amendment right to free speech and his
Fourteenth Amendment right to due process brought pursuant to 42 U.S.C. section
1983. The trial court also properly granted summary judgment with respect to Perry’s
claims for (1) slander, (2) defamation, and (3) intentional infliction of emotional
distress that are based on Greanias’s actions related to conducting the audit and acting
on the audit’s findings. However, we reverse the trial court’s judgment with respect
to Perry’s claims for (1) slander, (2) defamation, and (3) intentional infliction of
emotional distress to the extent they are based on Greanias’s alleged statements
following the publication of the audit. We remand the cause for further proceedings.

 

                                                                        Margaret Garner Mirabal
                                                                        Justice

Panel consists of Justices Mirabal, Jennings, and Duggan.




Publish. Tex. R. App. P. 47.